**Leon J. WHITE**

v.

**Warren M. BLOOMBERG, Postmaster, United States Post Office Department to be known as The United States Postal Service, et al.**

**Civ. No. 71–200–K.**

United States District Court,
D. Maryland.

June 23, 1972.

Peter S. Smith, and Charles A. Rees, Baltimore, Md., for plaintiff.

George Beall, U. S. Atty., and Jean G. Rogers, Asst. U. S. Atty., Baltimore, Md., for defendants.

FRANK A. KAUFMAN, District Judge.

This case presents the issue of whether a permanent postal employee, with a record of uninterrupted service from 1953 until his dismissal on October 30, 1970, can be discharged for failure to pay a single debt owed to the Post Office Credit Union of Maryland, Inc. (Credit Union), a nongovernmental body and thus a private creditor.[1] The plaintiff, Leon J. White, seeks herein a declaration that his discharge was unlawful, reinstatement to his former position, and an award of back pay from the date of his discharge.

The individual defendants are the Postmaster for the City of Baltimore, the Regional Director for the Washington Regional Office of the United States Postal Service, and the members of the United States Civil Service Commission. The United States Postal Service is also a named defendant.[2] The parties have filed cross-motions for summary judgment. The material facts, with certain exceptions noted in this opinion, are not disputed and can be summarized as follows:

On February 27, 1964, the plaintiff entered into a loan agreement with the Credit Union calling for the latter to loan to plaintiff $1420 to be used by him to purchase a secondhand car. A check for that amount, dated February 27, 1964, made payable jointly to plaintiff and to a Baltimore automobile dealer, was issued by the Credit Union to plaintiff. The next day, plaintiff signed a contract with the car dealer for the purchase of an automobile for $1820.08. On March 2, 1964, plaintiff endorsed the Credit Union check, gave it to the dealer, and agreed to pay the $390.08 balance of the purchase price from his own funds.

White testified during his hearing in Philadelphia in February, 1971 before the Regional Appeals Examiner of the United States Civil Service Commission that during the week before February 27, 1964, he had placed a $10.00 deposit on a car with the auto dealer "until [he] could make other financial arrangements" (Tr. 45) and that on February 27, 1964 he received his loan check from the Credit Union (Tr. 43–45).[2a] The check was made payable to White and the auto dealer and was endorsed by both of them. White stated during the February, 1971 hearing that after he decided to buy the car, Johns Hopkins Hospital sent him a notice that his two sons should be brought to the hospital for tests because it was thought they

---

1. The Credit Union is incorporated in Maryland pursuant to Md.Ann. Code art. 11, § 135 et seq. All of its officers and all of the members of its Board of Directors are, at the present time, and, at all times material herein, have been, employees or former employees of the Postal Service or the United States Post Office Department. The Credit Union presently occupies, rent free, space in the Post Office Building.

2. The United States Postal Service, "an independent establishment of the executive branch of the Government of the United States," 39 U.S.C. § 201, became in July, 1971 the successor to the United States Post Office Department and the Office of Postmaster General of the United States Post Office Department, pursuant to the Postal Reorganization Act, Pub.L. 91–375, 84 Stat. 719. Section 8 of that Act provides that ". . . employees of the Post Office Department shall become . . . employees of the United States Postal Service on [July 1, 1971]."

2a. The record of the February, 1971 hearing reveals that White signed a confessed judgment note on February 27, 1964.

had sickle cell anemia (Tr. 47–48);[2b] that when he received that notice he "knew [that he] couldn't go through with the car loan" (Tr. 48) and at the same time have the money to pay the possible medical expenses of his sons; that within a few days after he delivered the Credit Union check to the car dealer, he called both the Credit Union and the auto dealer (Tr. 48–49) and informed them he wanted the deal and the check cancelled (Tr. 48–50); that the next week (Tr. 50) someone from the auto dealer called him and asked if he wanted to borrow some money to make up the difference and that he replied in the negative (Tr. 51); that he never drove or rode in or received delivery of the car or even saw it from the day he first observed it and put down the $10.-00 deposit (Tr. 51–52); and that he assumed the deal was cancelled (Tr. 52).

On March 31, 1964, the Credit Union wrote to White stating legal action would be taken. On May 12, 1964, the Credit Union obtained a confessed judgment against plaintiff in the Superior Court of Baltimore City in the amount of $1742.50, i. e., the balance of the loan, plus court costs and an attorney's fee of $284. On or about October 9, 1964, the automobile was sold at a sheriff's sale for $1075, some $745 less than the purchase price plaintiff had agreed to pay.[3] After the costs of that sale were deducted, the net proceeds were turned over to the Credit Union's counsel who in turn forwarded $390.08 to the car dealer and the remainder to his client, the Credit Union. Thus, there was and remains outstanding in connection with the transaction a judgment balance of $965.-08, plus interest, court costs, and attorney's fees.

The Post Office Department records show, and plaintiff concedes, that during the several years after the 1964 judgment was obtained plaintiff received notices from officials of the Post Office Department advising him that he owed a debt to the Credit Union and that he was expected to pay it. On June 27, 1968, in response to continuing complaints to Post Office officials by the Credit Union, plaintiff was interviewed by a Post Office Department official concerning his indebtedness. During that interview, plaintiff signed an acknowledgment of the debt and agreed to pay $50.00 every other pay period until the debt was liquidated.[4] When plaintiff failed to honor that commitment, the Post Office Department issued to plaintiff a letter of warning on September 24, 1968, and when that letter brought no response, the Department suspended plaintiff from work for one day on June 24, 1969 for failure to pay the debt.

On April 21, 1970, plaintiff received a letter from defendant Bloomberg, the Baltimore Postmaster, stating that disciplinary action including removal from the Department was being contemplated because of plaintiff's failure to pay the $965.08 plus interest, court costs and attorney's fees to the Credit Union.[4a] That letter also indicated that plaintiff's past record, including the one-day suspension on June 24, 1969, would be considered in determining what action might be appropriate. Plaintiff was given an opportunity to respond, which he did by letter of April 30, 1970.

---

**2b.** In an affidavit filed in this Court, White states he was first so informed after he endorsed the check.

**3.** The reason for such a sizeable difference is not disclosed or in any way indicated in the record.

**4.** White testified during the February, 1971 hearing that he signed a paper agreeing to liquidate the judgment debt at the rate of $50 bi-monthly because he "was threatened with my job if I didn't make some sort of arrangements" (Tr. 60).

**4a.** Postal Manual, Part 745.12 provides: "Neither charges nor reference to past record may go back further than two years from the issuance date of the letter" of proposed adverse action, such as the April 21, 1970 letter White received from Bloomberg. Thus, were it not for the paper White signed on June 27, 1968, the adverse action letter of April 21, 1970 would have been barred by the limitations provision of Part 745.12 of the Postal Manual.

On July 24, 1970, defendant Bloomberg informed plaintiff that he would be removed from the Post Office Department on August 14, 1970 for failure to pay his debt. Plaintiff appealed that decision within the time allowed, and on September 11, 1970, an "Adverse Action Appeal" hearing was held before a Hearing Officer Investigator at which plaintiff appeared without counsel. On the basis of the Hearing Officer's report and findings of fact, defendant Ulsaker, the Regional Director for the Washington Regional Office of the United States Post Office Department, affirmed on October 13, 1970 the decision to remove plaintiff from the Post Office Department.

On October 30, 1970, plaintiff was removed from his employment by the Post Office Department. White has filed an affidavit in this proceeding stating that he has had no full-time employment since that date.

Plaintiff next appealed to the Philadelphia Region of the United States Civil Service Commission. After a hearing on February 18 and 19, 1971 before the Regional Appeals Examiner, at which plaintiff was represented by his present counsel, the Regional Director sustained, on March 29, 1971, plaintiff's discharge, concluding that the "agency's decision to effect removal, rather than some lesser disciplinary action, was not unreasonable, arbitrary or capricious and that the action was effected for such cause as would promote the efficiency of the service within the meaning of that language in the law and regulations." No subsidiary facts or reasons were given to underpin that conclusory approach.[5] Plaintiff appealed to the Board of Appeals and Review of the United States Civil Service Commission. On August 5, 1971, that Board sustained the decision of the Post Office Department to remove plaintiff for failure to pay the debt owed to the Credit Union, stating: "On the merits the Board finds that the reason for removal is sustained and considered with the cited past record removal was not an arbitrary, capricious or unwarranted action but instead was for such cause as will promote the efficiency of the service." No further administrative review is available to plaintiff. Accordingly, he has now exhausted all administrative remedies.[6]

Plaintiff's discharge occurred after seventeen years of service with the Post Office. At no time has there ever been any suggestion by anyone that plaintiff did not perform his duties satisfactorily or that any activity or lack of activity by plaintiff, either within or without the scope of his employment by the Post Office, other than in connection with his failure to pay the one debt in issue in this case, was offensive in any way to anybody. Rather, the record establishes that plaintiff was discharged only and solely for failure to pay the single debt to the Credit Union. There is also no evidence in the record to sustain any inference that plaintiff's failure to pay his debt to the Credit Union was considered differently by the Post Office Department or any administrative hearing official because of any concern the Post Office Department had with regard to the financial soundness of the Credit Union.

5. Prior to March 29, 1971, namely on February 24, 1971, plaintiff, through his present counsel, instituted this case in this Court, seeking, *inter alia*, immediate equitable relief so as to require the Post Office Department to reinstate him. This Court, on February 25, 1971 and on March 2, 1971, denied such relief on the grounds that on those dates the Regional Director had not then rendered his decision and that in addition plaintiff had available to him further administrative review.

6. Because plaintiff had no right to compel attendance of witnesses or production of evidence at any stage of the administrative proceedings concerning his dealings with the auto dealer and/or the Credit Union, plaintiff was unable to present evidence concerning plaintiff's allegations stated to this Court that he was dealt with unfairly by one or both of them and that there was a failure to eliminate or at the very least mitigate damages.

To the contrary, the record reveals that defendants have taken the position that plaintiff's failure to pay the Credit Union has been treated on all executive and administrative levels no differently than plaintiff's failure to pay any other creditor would have been treated.

During the proceeding in this Court after completion of the administrative hearings, counsel for the defendants filed a number of letters contained in the files of the Post Office. *Inter alia,* those letters reveal that on May 4, 1964, about one week before the entry of judgment, the auto dealer's attorney wrote to the Baltimore Postmaster stating, *inter alia:*

> Our client is willing to try to work out an agreeable settlement of this matter, but it is imperative that it have the cooperation of Mr. White, since the title to the automobile has been transferred to him according to the records of the Department of Motor Vehicles. I would, therefore, certainly appreciate any efforts your Department could make with respect to having Mr. White contact the undersigned, so that this matter can be cleared up with a minimum of expense and effort.

That attorney again wrote to that official as follows on July 10, 1964, apparently two months after the confessed judgment had been entered:

> On May 4, 1964, I wrote you requesting your help in having Mr. White contact the undersigned with reference to the purchase of an automobile from our client . . . . I received notification from your office that said communication had been received and that it would receive prompt attention. Unfortunately, I have not heard anything further.
>
> Since [our client] and the Post Office Employees Credit Union, Inc. (which advanced Mr. White $1,420.00, as partial payment for said automobile) wish to work this matter out in

the most agreeable manner possible with the buyer, I must again request that Mr. White contact me, immediately.

> I certainly appreciate any efforts your Department has made and will make in this matter.

And on October 30, 1964 the Credit Union's attorney addressed this letter to that same official:

> Please be advised that this office represents the Baltimore Post Office Employees Credit Union, Inc. which under date of May 12, 1964 claimed a Judgment by Confession in the Superior Court of Baltimore City against the above captioned in the amount of $1,441.30.
>
> The facts leading up to this Judgment are basically that Mr. White purchased an automobile from [the car dealer] and made a $50.00 deposit on the same. He then made application to the Credit Union to borrow $1,420.00, apparently being the balance due on the automobile. The Credit Union advanced this money by way of check payable to both Mr. White and [the car dealer]. No delivery of the car was made at that time, as unknown to the Credit Union, the sum of $390.03 was still due to [the car dealer], for which sum they retained the car on a basis of a Vendor's Lien.
>
> The automobile had already been titled in the name of Mr. White. Mr. White refused to pay the balance due and apparently thought he could simply wash his hands of the entire matter. This office made an arrangement with [the car dealer] whereby they would return the $1,420.00 provided Mr. White reassign the automobile to them and paid the cost of the transfer. Mr. White refused to do anything. Thereafter, on May 15, 1964, Mr. White agreed to make periodic payments on this Judgment but to

date we have not received any of the promised payments.

There being no other alternative, the automobile was sold at a Sheriff's Sale and I enclose herewith a copy of the advertisement for said sale. After deducting the prior Vendor's Lien, as well as the costs and expenses of the sale, there still remains $965.08 due the Credit Union.

I do not feel that this action by Mr. White, and the attended publicity as indicated by the enclosed is in the best interest of the postal service, particularly the continued refusal of Mr. White to make any arrangements to repay the money which he borrowed from the Credit Union.

I believe that Part 744 435 of the Postal Regulations prohibits this type of action by a postal employee and permits disciplinary action if the same remains unremedied.

I would accordingly appreciate any help which you could give us in this matter, particularly as the salaries and other benefits due governmental employees are protected from attachments.

White's attorney in this case has informed this Court that he had examined the October 30, 1964 letter before the February 18–19, 1971 hearing. In the course of that hearing, White testified without objection that he never was informed that the title to the car was placed in his name until he was so informed by his present attorney a few days prior to the February 18–19, 1971 hearing; that he never knew of the auction before it took place; and that no one representing or speaking on behalf of the auto dealer or the Credit Union ever informed him of the possibility of putting the car title back in the name of the auto dealer if White paid the cost of transfer (Tr. 54–55). Over objection by

counsel for the Post Office Department, White testified that if he had been so informed and been given the opportunity of paying $50–$100 of costs he would have done so (Tr. 55–56).

The aforementioned October 30, 1964 letter from the Credit Union's attorney and the prior May 4, 1964 and July 10, 1964 letters from the auto dealer's attorney were not introduced into evidence during the February 18–19, 1971 hearing. Nor was there any testimony from either of those attorneys or from anyone who allegedly acted for or on behalf of the auto dealer or the Credit Union prior to the confession of judgment on May 12, 1964.

Counsel for both sides agree that White had no power to subpoena any witness such as attorneys for or officials of the auto dealer or the Credit Union to testify at the February 18–19, 1971 hearing. Counsel for White has represented to this Court that he specifically elicited White's testimony with regard to any retransfer offer to establish the lack of such an offer. The possibility of a remand by this Court for a further administrative hearing so as to enable the taking of further evidence in that connection has been considered. In view of the lengthy period which has already been occupied by the administrative and judicial processes in this case, such a remand is not, in this Court's opinion, appropriate. It would appear clear from the March 31, 1964 letter of the Credit Union and the May 12, 1964 confessed judgment, taken eight days after the May 4, 1964 letter, that the auto dealer and the Credit Union moved quickly. Moreover, White's testimony on February 18–19, 1971 is uncontradicted and was not impeached or even challenged during that hearing. Further, the postal authorities from the start have seemingly considered White's case on the basis that such testimony

was immaterial and that all that was material was White's failure to pay the single judgment debt.

▮▮▮ Plaintiff asserts the existence of federal jurisdiction under each of 28 U.S.C. § 1331,[7] 28 U.S.C. § 1343(4),[8] 28 U.S.C. § 1339,[9] 39 U.S.C. § 409(a),[10] and 5 U.S.C. § 702, the latter embodying the judicial review provisions of the Administrative Procedure Act.[11] However, it

7. § 1331. *Federal question; amount in controversy* . . .

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

\* \* \* \* \*

8. § 1343. *Civil rights and elective franchise*

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\* \* \* \* \*

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

The amount of $10,000 in controversy is not required under this section. C. Wright, Law of the Federal Courts § 32 at 108 (2d ed. 1970). Defendants contend that § 1343(4), like § 1343(3), only applies to suits seeking to redress the deprivation of personal rights and liberties and not the deprivation of property rights, including discharges from public employment. *See* Hague v. C.I.O., 307 U.S. 496, 531, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (Stone, J., concurring). However, the Supreme Court has recently, expressly rejected the personal right-property right distinction in a case brought under § 1343(3). Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972).

9. § 1339. *Postal matters*

The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service.

The Sixth Circuit has indicated that there is no amount in controversy prerequisite for actions brought under this section. *See* Griffith v. W. S. Wick Grocery Co., 272 F. 246, 249 (6th Cir. 1921). Although *no cases* involving the discharge of postal employees have been brought under § 1339, the language of that statute would appear to provide a jurisdictional basis in a case in which the employee alleges, as plaintiff does herein, that his discharge was in violation of a statute governing and protecting the rights of postal employees. See United States v. Branch 60 National Association of Letter Carriers, 312 F.Supp. 619, 621 (D.Conn.1970) (Timbers, J.).

10. § 409. *Suits by and against the Postal Service*

(a) Except as provided in section 3628 [decisions of the Postal Rate Commission] of this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service. Any action brought in a State court to which the Postal Service is a party may be removed to the appropriate United States district court under the provisions of chapter 89 of title 28.

No suits involving wrongful discharge of postal employees have been brought under this section.

11. § 702. *Right of review*

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

This Court, as did the Supreme Court in Tooahnippah v. Hickel, 397 U.S. 598, 90 S.Ct. 1316, 25 L.Ed.2d 600 (1970), expresses *no opinion* on the question of whether the judicial review sections of the Administrative Procedure Act independently confer jurisdiction. In Rusk v. Cort, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962), the Supreme Court apparently assumed it had jurisdiction under § 702 to review agency actions. Commenting on Rusk v. Cort, *supra,* Professor Davis has written:

The Supreme Court has quite properly assumed that one who is entitled to review under the Administrative Procedure Act cannot be denied review on the ground that a district court lacks jurisdiction to provide it. [K. Davis, Administrative Law Treatise 789 (1970 Supp.).]

The Fourth Circuit has held that the Administrative Procedure Act confers jurisdiction to review a federal agency's discharge of an employee. McEachern v. United States, 321 F.2d 31 (4th Cir. 1963). *See* Halsey v. Nitze, 390 F.2d 142 (4th Cir.), cert. denied, 392 U.S.

is not necessary in this case to consider independently the existence of jurisdiction, *vel non*, under each one of those statutes because jurisdiction is present under the basic grant of power to the federal courts set forth in 28 U.S.C. § 1331 to hear and determine controversies arising under the Constitution or laws of the United States when the amount in controversy exceeds $10,000. Plaintiff alleges herein violations of rights protected by the Fifth and Ninth Amendments to the Constitution and also by one or more federal statutes and regulations. At the time he was dismissed from the Post Office Department on October 30, 1970, plaintiff's annual salary was $9938.00. Thus, viewing this case solely as a suit to enjoin defendants from refusing to reinstate plaintiff to his former position, the value of the rights White seeks to protect, that is, his right to federal employment, exceeds $10,000. *See* Glenwood Light and Water Co. v. Mutual Light & Power Co., 239 U.S. 121, 126, 36 S.Ct. 30, 60 L.Ed. 174 (1915). *See generally* C. Wright, Law of the Federal Courts § 34 (2d ed. 1970); 1 J. Moore, Federal Practice ¶ 0.96 (2d ed. 1964). Probable future earnings and retirement and other benefits may be considered in determining whether the $10,000 jurisdictional amount requirement of section 1331(a) is satisfied. Friedman v. International Association of Machinists, 220 F.2d 808 (D.C.Cir.), cert. denied, 350 U.S. 824, 76 S.Ct. 51, 100 L.Ed. 736 (1955); Nord v. Griffin, 86 F.2d 481 (7th Cir. 1936), cert. denied, 300 U.S. 673, 57 S.Ct. 612, 81 L.Ed. 879 (1937).

■ Defendants, however, contend that although this suit is nominally brought against individual federal officials and the Postal Service, it is in fact a suit against the United States and thus is barred by the doctrine of sovereign immunity. In Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963), Mr. Justice Clark wrote:

> The general rule is that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration." Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed.2d 1209 (1947), or if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act." Larson v. Domestic & Foreign Commerce Corp., supra, 337 U.S. at 704, 69 S.Ct. 1457, 93 L.Ed. 1628
> . . . .

Mr. Justice Clark further noted that the general rule is limited by two well-established exceptions, namely, "(1) action by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void." 372 U.S. at 621–622, 83 S.Ct. at 1007. *See* Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

By alleging that the individual defendants herein acted in excess of their authority under the applicable federal statutes and regulations governing the discharge of government employees, and by alleging that, insofar as those statutes and regulations permit plaintiff to have been discharged under the circumstances of this case, those statutes and regulations have been unconstitutionally applied to him, plaintiff has brought his case within both of the exceptions referred to in Dugan v. Rank, supra. *See* Knox Hill Tenant Council v. Washington, 145 U.S.App.D.C. 122, 448 F.2d 1045 (1971), at 13–14. Nor does the injunctive relief requested in this case in any way present the danger of "substantial bothersome interference with

---

939 (1968); Mindel v. United States Civil Service Commission, 312 F.Supp. 485, 486–487 (N.D.Calif.1970). Upon such review the applicable standards are the twin tests of substantial evidence, and

lack of arbitrary and capricious agency action constituting an abuse of discretion or being otherwise not in accordance with law. Halsey v. Nitze, *supra*; McEachern v. United States, *supra*.

the operation of government" which it is the underlying purpose of the doctrine of sovereign immunity to prevent. Littell v. Morton, 445 F.2d 1207, 1214 (4th Cir. 1971). Plaintiff's reinstatement to his position as a Postal Service employee, if he is entitled to such relief, would require only a ministerial act of the appropriate Postal Service officials. Accordingly, this Court concludes that sovereign immunity is not a bar to plaintiff's suit for declaratory and injunctive relief.[12]

■ Whether this Court has the power to award plaintiff back pay is a matter which is less easily resolved. In cases in which the remedy sought is a judgment for back pay which can be satisfied only out of the public treasury of the United States, the United States itself is an indispensable party and when, as in the present case, the plaintiff has failed to join the United States as a party defendant, the claim must be dismissed if it is asserted against the Government as such. Zapata v. Smith, 437 F.2d 1024, 1027 (5th Cir.1971). Moreover, it is to be noted that 28 U.S.C. § 1346(a) (2) confers jurisdiction upon a federal district court only when the claim is less than $10,000.[13] Plaintiff's claim for back pay in this suit exceeds $10,000 and accordingly cannot be asserted in this Court, but rather only in

the Court of Claims, pursuant to 28 U.S.C. § 1491, if it is a claim against the Government as such.[14] *See* 7B J. Moore, Federal Practice ¶ 1346 at 527 (2d ed. 1971).

■ However, the United States Postal Service, not the former Post Office Department, is one of the named defendants in this case. As such, it is an establishment existing independently of the executive branch of the United States[15] with the power "to sue and be sued in its official name."[16] Further, the sovereign immunity of the United States has not been bestowed upon it. A suit against it, *i.e.*, the Postal Service, for back pay is not a claim against the United States within the meaning of 28 U.S.C. § 1346(a) (2). *See* Reconstruction Finance Corp. v. Langham, 107 F. Supp. 482, 484 (M.D.Tenn.1952), aff'd, 208 F.2d 556, 559 (6th Cir.1953). *Cf.* Williams v. United States, 139 F.Supp. 951, 952 (Ct. of Claims 1956). Moreover, the United States Attorney, as counsel for the Postal Service[17] as well as for all of the other defendants in this case, has informed this Court, by copy of a letter from the Law Department of the United States Postal Service, that the Postal Service has assumed liability for the back pay of all persons found to have been wrongfully discharged by its predecessor, the United States Post Of-

---

12. With respect to the defendant United States Postal Service, 39 U.S.C. § 401 would appear to waive sovereign immunity. That section provides:
 The Postal Service shall have the following general powers:
 (1) to sue and be sued in its official name; * * *.

13. That section provides:
 (a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
 * * * * *
 (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

14. That section provides, in relevant part:
 The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
 It is also to be noted that while the Court of Claims has the power to award actual, presently due money damages, it has no power to grant declaratory or other equitable relief. United States v. King, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).

15. 39 U.S.C. § 201.

16. 39 U.S.C. § 401(1). See n. 12 *supra*.

17. 39 U.S.C. § 409(d).

fice Department, after July 1, 1970. Plaintiff was discharged on October 30, 1970. Thus, the Postal Service has assumed liability, if any exists, for whatever back pay may be owed to plaintiff by the Post Office Department. Further, it is not disputed that if plaintiff was wrongfully discharged by the Post Office Department, he is entitled to an award of back pay from that Department under the Back Pay Act, 5 U.S.C. § 5596.[18] Accordingly, this Court concludes that it has jurisdiction to award back pay in this case as well as to grant the equitable relief sought by plaintiff.

■ The number of bases of jurisdiction asserted by plaintiff is surpassed only by plaintiff's listing and discussion of alternative bases for relief. Plaintiff contends that his discharge for failure to pay his debt to the Credit Union violates the equal protection and due process guarantees of the Due Process Clause of the Fifth Amendment, his right of privacy as guaranteed by the Fifth and Ninth Amendments, the provisions of 5 U.S.C. § 7501(a) and 5 U.S.C. § 1674 and of several Post Office Department regulations. Because this Court agrees that plaintiff's discharge violated 5 U.S.C. § 7501(a) and the applicable Post Office Department regula-

tion dealing with employees who fail to meet their financial obligations, it is not necessary to decide the constitutional and other statutory and regulatory issues presented by plaintiff.

■ The Postal regulation, 39 C.F. R. § 742.735–29(d), which was the basis for plaintiff's discharge, provides, in pertinent part:

(d) *Indebtedness.* (1) an employee shall pay *each just financial obligation* in a proper and timely manner, especially one imposed by law such as Federal, State, or local taxes. For the purpose of this section, a "just financial obligation" means one acknowledged by the employee or reduced to final judgment by a court, and "in a proper and timely manner" means in a manner which the Department determines does not, under the circumstances, *reflect adversely on the Government as his employer.* In the event of dispute between an employee and an alleged creditor, this section does not require the Department to determine the validity or amount of the disputed debt or to institute disciplinary proceedings.

\* \* \* \* \* \*

(7) *Failure to pay just financial obligations will be regarded as cause for*

---

18. § 5596. *Back pay due to unjustified personnel action*

(a) For the purpose of this section, "agency" means—

(1) an Executive agency;

(2) the Administrative Office of the United States Courts;

(3) the Library of Congress;

(4) the Government Printing Office; and

(5) the government of the District of Columbia.

(b) An employee of an agency who, on the basis of an administrative determination or a timely appeal, is found by appropriate authority under applicable law or regulation to have undergone an unjustified or unwarranted personnel action that has resulted in the withdrawal or reduction of all or a part of the pay, allowances, or differentials of the employee—

(1) is entitled, on correction of the personnel action, to receive for the

period for which the personnel action was in effect an amount equal to all or any part of the pay, allowances, or differentials, as applicable, that the employee normally would have earned during that period if the personnel action had not occurred, less any amounts earned by him through other employment during that period; and

(2) for all purposes, is deemed to have performed service for the agency during that period, except that the employee may not be credited, under this section, leave in an amount that would cause the amount of leave to his credit to exceed the maximum amount of the leave authorized for the employee by law or regulation.

\* \* \* \* \*

The Back Pay Act was applicable to the Post Office Department until June 30, 1971 when the operation of the Post Office Department was taken over by the Postal Service. See n. 2 *supra.*

*disciplinary action.* . . . [19] [Emphasis added.]

The Post Office Department's discretion in applying that regulation was strictly limited by 5 U.S.C. § 7501(a) which requires that "an individual in the competitive service may be removed . . . only for such cause as will promote the efficiency of the service." That discretion was also subject to 39 C.F.R. § 742.-735–29(d) (6), which stated that the Post Office Department is not "expected to act as a collection agent"; and to Postal Manual, Part 745.111, which provided that the "goal in taking disciplinary action is to retain in the postal service employees who are already experienced in the work and in whom the Post Office Department already has an investment." Without ignoring the safeguards against arbitrary dismissal from public employment which are embodied in that statute and in those regulations, an employer agency cannot justify a discharge merely by reciting in conclusory fashion the language of the statute. Instead, the agency "must demonstrate some 'rational basis' for its conclusion that a discharge 'will promote the efficiency of the service.' " Norton v. Macy, 135 U.S.App.D.C. 214, 417 F.2d 1161, 1164 (1969).

In Norton v. Macy, the Court held that a budget analyst in the National Aeronautics and Space Administration, who concededly had engaged in homosexual activity, had been unlawfully discharged because the record before the Court "[did] not suggest any reasonable connection between the evidence against [the employee] and the efficiency of the service . . . ." 417 F.2d at 1162. In reaching that conclusion, Judge Bazelon specifically acknowledged that in a number of cases courts have upheld an agency's discharge of an employee for financial irresponsibility. However, he noted that in each of those cases there existed rational bases for the agency's conclusion that the financial irresponsibility of

the employee had seriously impaired the agency's ability to perform its duties. He also wrote (at 1168):

Appellee relies on the cases which have sustained dismissals on account of financial irresponsibility. [29] Some of

29. Jenkins v. Macy, 357 F.2d 62 (8 Cir. 1966); McEachern v. Macy, 341 F.2d 895 (4 Cir. 1965); Carter v. Forrestal, 85 U.S.App.D.C. 53, 175 F.2d 364 (1949); cert. denied, 338 U.S. 832, 70 S.Ct. 47, 94 L.Ed. 507 (1949).

these cases have, indeed, cited the risk of "embarrassment" or "discredit" to the employing agency; but the risk to which they refer involves a special kind of embarrassment. The wages of governmental employees, unlike those of other employees, are not subject to garnishment. Creditors, thus deprived of an important security and collection device, may frequently importune a federal employer to pressure delinquent employees into paying their debts. Such importunings in themselves necessarily have some effect on the efficiency of the service. Moreover, it is likely that commercial establishments would refuse to extend credit to many otherwise eligible federal employees without some assurance of employer support for their collection efforts. That eventuality, should it occur, would have an obvious impact on the attractiveness of federal employ and, in turn, on the quality of the government's work product. In short, the anticipated discredit to the agency from an employee's financial delinquency is discredit with a specific sector of the public which may have an ascertainable effect on the agency's ability to perform its duties. The concern at least relates to some more concrete injury to the service than a general tarnishing of an agency's antiseptic public image. Furthermore, it is especially significant that the Civil Service Commission apparently does not invariably discharge known financial delinquents: agencies are ex-

19. In addition, *see, inter alia*, 29 C.F.R. §§ 742.735–23(b) and 29(d) (2). Those

regulations were issued under the authority of 5 U.S.C. § 301 and 39 U.S.C. § 501.

pected to consider the employee's good faith and to make efforts to persuade him to pay his debts as soon as possible; *only inveterate and unrepentant deadbeats are to be disciplined by dismissal.* [Emphasis added; certain footnotes omitted.]

An examination of the cases cited in Norton v. Macy bears out Judge Bazelon's analysis of agency actions taken pursuant to 5 U.S.C. § 7501(a). In Jenkins v. Macy, 357 F.2d 62 (8th Cir. 1966), the General Services Administration had received forty separate complaints, concerning the failure of a custodial laborer to pay his just financial obligations, from eleven different creditors over a period of three years. In McEachern v. Macy, 233 F.Supp. 516 (W.D.S.C.1964), aff'd, 341 F.2d 895 (4th Cir.1965), the employee was charged with eight instances of financial delinquency. *But see* Carter v. Forrestal, 85 U.S.App.D.C. 53, 175 F.2d 364 (1949), cert. denied, 338 U.S. 832, 70 S.Ct. 47, 94 L.Ed. 507 (1949), in which the Court held there could be no judicial review of whether a discharge of a clerk-typist for failure to pay two outstanding judgment debts, concerning which his employer, the Department of the Army, received sixteen complaints, constituted such " 'cause as will promote the efficiency of the service.' " 175 F.2d at 365. That view was at the very least inferentially questioned in Norton v. Macy, *supra.* However, it must also be noted that in *Carter,* the Court stated: "If the decision of the Civil Service Commission were open to review, we find ample evidence in the record to support the conclusion reached. Its decision was in no manner arbitrary, capricious or unreasonable." 175 F.2d at 366.

The most recent decision of the Board of Appeals and Review of the United States Civil Service Commission supports the conclusion that discharges for financial irresponsibility are considered by that administrative agency to be required for the good of the service, only under special circumstances. In that case, In the Matter of George H. Pierce, decided on September 14, 1971,[20] the Board ordered reinstatement of a Post Office Department employee who had been discharged under 39 C.F.R. § 742.-735–29(d) for failure to pay a single debt. The facts and the administrative decision in *Pierce* warrant detailed comparison with the facts and the administrative decision in the within case.

Pierce owed a single debt of $305.62 arising from the purchase of a T.V. set which stopped working 40 days after its purchase by Pierce and which could not be repaired. Plaintiff herein owes a single debt of $965.08 for a car of which he never took possession. Pierce's debt had been outstanding for almost five years, plaintiff's for over six. In both cases, the Post Office Department had received numerous letters of complaint from the respective creditors. Both Pierce and plaintiff apparently promised to make efforts to liquidate their respective debts, and both failed to honor those commitments. Pierce had received a letter of reprimand prior to his suspension while plaintiff had received both a reprimand and a one-day suspension.

In the within case, the Board of Appeals and Review sustained the Post Office Department's removal of plaintiff on the grounds that there was sufficient evidence of financial irresponsibility and that the discharge was for the good of the service. On the other hand, in *Pierce,* the Board concluded:

> The Board agrees that the agency mis-applied its regulations. *The word "obligations" is indeed used in the plural, indicating the intent of the regulation is that it be used against "dead-beat" employees who utilize the fact that a Federal employee's wages may not be garnisheed as a shield against paying their creditors.* The record does not show that Mr. Pierce is such an employee. Quite the contrary. The record gives *but one in-*

---

20. Five weeks after the Board's decision involving plaintiff. See p. 7, *supra.*

*stance wherein he has erred*, and that relates to *non-payment of a single obligation*. The Board finds that it is unreasonable to remove Mr. Pierce under the circumstances shown herein. The Board further finds that his removal would not promote the efficiency of the service. [Emphasis added.]

At the request of plaintiff and pursuant to the course advocated by Mr. Justice Harlan in Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970),[21] this Court requested that the Commissioners of the United States Civil Service Commission, who are among the defendants herein, submit a statement of the Commission's views with respect to 39 C.F.R. § 742.735–29(d) (1) and (7), both in general and in the light of the decisions of the Board of Appeals and Review in the cases of plaintiff and *Pierce*. In a letter to this Court dated December 1, 1971, the Commission, through its General Counsel, responded to that request. In essence, the General Counsel attempted to reconcile the different results in *White* and *Pierce* on the ground that in *White* the facts justified the conclusion that the discharge was "for the efficiency of the service" while in *Pierce* that finding was not supported by the record. However, the Commission's answer does not disclose, nor has this Court, after repeated scrutiny of the two decisions of the Board of Appeals and Review, been able to discern, what material facts were determinative in *White* which were not also present in *Pierce*.[22]

█ When the same administrative body treats similar cases in dissimilar ways, it engages in arbitrary action, directly contrary to the rule of law. Recently, the Court of Appeals of the Dis-

21. In that case, which involved the interpretation of regulations promulgated by the Department of Health, Education and Welfare, Mr. Justice Harlan wrote:

Whenever possible the district courts should obtain the views of HEW in those cases where it has not set forth its views, either in a regulation or published opinion, or in cases where there is real doubt as to how the Department's standards apply to the particular state regulation or program.

397 U.S. *supra* at 407, 90 S.Ct. at 1215 (footnote omitted).

22. The letter of the Commission's General Counsel *contains* these passages:

Whether a particular employee's failure [to pay his debts] requires an imposition of discipline is for the employee's superiors to determine on the basis of the facts at hand. * * *

The [White] decision further found that Mr. White's removal would promote the efficiency of the service under the facts present. * * *

The Board's statement relative to the plural use of the word "obligations" is correct in the general context in which it was used, to emphasize that the regulatory intent is to proscribe "dead-beat" debt delinquency. It is incorrect to lift that statement from the case and use it out of context in an effort to limit the substantive coverage of the regulation under totally different facts.

It is unquestionable that an employee under certain circumstances can create as much, or more, of an adverse effect on the "efficiency of the service" with one failure to pay a just debt as another with more than one such failure. In such a personnel matter it is not material whether the failure is singular or plural but how it effects [sic] the Government service. (See Norton v. Macy, 417 F.2d 1161, 1168 (D.C.Cir. 1969))

The Board's statement in *Pierce* "that the agency misapplied its regulations" must not be taken out of context. The controlling regulatory language is that "An employee shall pay each just financial obligation . . . .". While we recognize the ambiguity of the Board's statement when quoted out of context, when the Board's decision is read in its entirety no question exists as to its ultimate correctness. The facts that led to Mr. Pierce's restoration did not depend on the singularity of his debt but rather on other facts set forth in that decision.

In the judgment of the Civil Service Commission, the regulations of the Postal Service do not prohibit that agency from effecting a disciplinary action on the basis of a single failure to pay a just debt when the circumstances of that failure establish a valid statutory cause for the action, i. e., one that promotes the efficiency of the service.

trict of Columbia has had occasion to consider conflicting decisions by the Federal Communications Commission. In so doing, Judge Wright wrote:

> Faced with two facially conflicting decisions, the Commission was duty bound to justify their coexistence. The Commission's utter failure to come to grips with this problem constitutes an inexcusable departure from the essential requirement of reasoned decision making. The rule of law is intended to eliminate the appearance as well as the reality of arbitrariness, and if the public's faith in its administrative agencies is to be maintained, it is imperative that these agencies act in a wholly rational, logical fashion, completely free from even the appearance of bias, prejudice and improper influence. * * *

> Put to the test under pressure it waffled. * * * Under the circumstances, its arbitrary action may not stand. [Footnote omitted.]

Columbia Broadcasting System, Inc. v. Federal Communications Commission, 454 F.2d 1018 (D.C.Cir. 1971), at 18–19. See Burinskas v. N.L.R.B., 123 U.S. App.D.C. 143, 357 F.2d 822, 827 (1966). Cf. Melody Music, Inc. v. Federal Communications Commission, 120 U.S.App. D.C. 241, 345 F.2d 730, 732–33 (1965). While courts will not disturb an administrative interpretation or application of a regulation unless the same is clearly erroneous, Jno. McCall Coal Co. v. United States, 374 F.2d 689, 691–92 (4th Cir. 1967), the situation is different when an administrative interpretation is not in accord with the meaning and purpose of the regulation and/or if the administrative agency's applications of its own regulation are irreconcilably in conflict.

 Plaintiff's discharge for failure to pay the single debt owed to the Credit Union fails to conform to the requirements of the statute and regulation in two respects. First, the *Pierce* case makes it clear, as does the dictum in Norton v. Macy, *supra* at 1168, that the intent of regulations such as the Postal Service regulation applicable herein, is to enable removal of inveterate deadbeats. Employees who owe only a single debt are usually not considered to be inveterate deadbeats. Having interpreted and applied, as it did in *Pierce*, its own applicable agency regulation, the Commission may not, as of this date, be permitted to enforce against plaintiff a different interpretation and a different application of that same regulation. *See generally* Heffner v. United States, 420 F.2d 809 (4th Cir. 1970); United States ex rel. Brooks v. Clifford, 409 F.2d 700 (4th Cir. 1969); Francis v. Davidson, 340 F.Supp. 351 (D.Md.1972), at 365–366.

Secondly, assuming that the Commission is correct in its statement in its letter addressed to this Court that (despite the rather strong language to the contrary in *Pierce*) "it is not material whether the failure is singular or plural but how it effects [sic] the Government service . . . (See Norton v. Macy, 417 F.2d 1161, 1168 (D.C.Cir. 1969))," [23] the Commission has not pointed to any evidence in the record in this case which suggests "any reasonable connection between the evidence against [plaintiff] and the efficiency of the service." Norton v. Macy, *supra* at 1162. In McEachern v. Macy, 233 F.Supp. *supra* at 521, the Court held that the Commission drew "a justifiable inference" of harm to the government agency through continued employment of "a person in a responsible position who was neglectful of his personal financial obligations." Affirming per curiam, the Fourth Circuit noted (at 341 F.2d *supra* at 896) "ample support [in the record] for the Commission's finding and conclusion." The eight defaults of McEachern, a Social Security Administration hearing examiner, apparently not claimed by him to be other than just debts, are to be contrasted with the single failure of the plaintiff-mail carrier and the circum-

---

23. See n. 22 *supra*.

stances under which the single debt in this case arose—a debt which has been in existence since 1964.[23a] Plaintiff disputes the *bona fides* of that debt, a position of which the Post Office Department official who was most responsible in initiating disciplinary action against plaintiff stated he was unaware until after he had caused such action to be commenced. In fact, that official testified during the February, 1971 hearing that he might have taken another course of action if he had been aware of such dispute before the first disciplinary steps were taken (Tr. 113).[24]

The fact that other federal agencies may not discharge their employees for failure to pay one debt is also noted. Thus, in McGuire v. United States, 145 Ct.Cl. 17 (1959), the Court of Claims granted back pay to an Internal Revenue Service employee on the ground that Treasury Department regulations providing for discipline because of habitual refusal to pay debts did not permit removal for failure to pay one debt. And under 45 C.F.R. § 73.735–701, HEW can discipline an employee for improper handling of his own financial affairs if complaints of his creditors cause HEW to devote a considerable amount of official time, or the employee's financial problems impair his job efficiency, or the attitude of the general public toward HEW is adversely affected. Here, none of those factors were seemingly present. Perhaps, to some degree, the last-mentioned factor can be inferred, but no more here than in Pierce.

One of the most interesting contentions stated by plaintiff relates to the prohibition in the Consumer Credit Protection Act, 15 U.S.C. § 1674, that—

(a) No employer may discharge any employee by reason of the fact that his earnings have been subjected to garnishment for *any one indebtedness*. [Emphasis added.]

Defendants' position is that that section does not apply to a government agency such as the Post Office Department. And it was that Department which discharged White on October 30, 1970, not the Postal Service which was not yet then in existence. It may well be that the Consumer Credit Protection Act does not apply to a federal governmental agency such as the Post Office Department was. Herein it is not necessary for this Court to reach that question or to make any determination with regard to the applicability, *per se*, of the Consumer Credit Protection Act.[25] But it would seem that the general spirit of the congressional prohibition in Section 1674, enacted in 1968 and effective July 1, 1970, against discharge of an employee because of garnishment for a single indebtedness, at the very least should have suggested in 1970 to the Post Office Department and in 1971 to the Civil Service Commission that in the absence of any compelling factual difference, they should not have approved the discharge of one postal employee owing a single debt, *i.e.*, White, and proscribed the discharge of another postal employee, also owing only a single debt, *i.e.*, Pierce.

Plaintiff's motion for summary relief is hereby granted; defendants' motion for summary judgment is hereby denied.

---

23a. See n. 4 and n. 4a, *supra*.

24. That same official testified in the February, 1971 hearing (Tr. 102) that he handled approximately 1100 debt complaints per year, that no postal employees in Baltimore were discharged in 1970 for failure to pay debts, and only one such removal occurred in 1969.
 *See also* 39 C.F.R. § 742.735–29(d) (1) with regard to the relevance of the existence of the dispute and its effect upon the exercise of discretion by those in the Post Office in commencing disciplinary action for failure to pay a debt.

25. *See* 15 U.S.C. § 1612. *But see* Knox Hill Tenant Council v. Washington, 448 F.2d 1045 (D.C.Cir. February 4, 1971), in which the Court discusses the applicability of the District of Columbia Housing Code to public housing owned by an agency of the United States Government. *See also* Ruhl v. Railroad Retirement Board, 342 F.2d 662 (7th Cir. 1965).

The defendant Postal Service shall without delay reinstate plaintiff and pay to him back pay from the date of his discharge, namely, October 30, 1970, to the date of his reinstatement. It is so ordered.