Jose **CHAVEZ–SALIDO** et al., Plaintiffs,

v.

Clarence E. **CABELL,** in his official capacity as Acting Chief Probation Officer of Los Angeles County, et al., Defendants.

No. CV 76–0541–IH.

United States District Court,
C. D. California.

Feb. 3, 1977.

Addendum to Opinion March 14, 1977.

Richard A. Paez, Michele Washington, Western Center on Law and Poverty, Inc., Los Angeles, Cal., for plaintiffs.

Philip H. Hickok, Deputy County Counsel, Los Angeles, Cal., for defendants.

OPINION

Before BARNES, Senior Circuit Judge, CURTIS, Senior District Judge, and IRVING HILL, District Judge.

HILL, District Judge:

In this opinion, in a case of first impression, we declare unconstitutional California Government Code § 1031(a). That section provides that one must be a citizen of the United States to hold any governmental position, state, county or local, which is declared by law to be a peace officer or which has the powers of a peace officer. The case is brought by three plaintiffs who applied for, and were denied, appointment to the position of Los Angeles County deputy probation officer solely because of the statutory requirement of American citizenship. Under California Penal Code § 830.5 a deputy probation officer is declared to be a peace officer and is therefore subject to the citizenship requirement of Government Code § 1031(a). We hold § 1031(a) to be

both unconstitutional on its face and unconstitutional as applied. We also hold that a county may be held liable for damages in an action brought directly under the 14th Amendment and in an action brought under 42 U.S.C. § 1981.

## I

## FACTS

Plaintiffs, Chavez-Salido, Ybarra and Bohorquez, as of the date the complaint was filed, were lawfully admitted permanent resident aliens living in Los Angeles County. In a single-count first amended complaint seeking both injunctive relief and damages, they sue Los Angeles County, its Chief Personnel Officer, its Acting Chief Probation Officer and the Personnel Officer of the County's Probation Department.[1] The case was tried without live witnesses. Most of the facts were stipulated to and some additional facts were received by uncontradicted affidavits.

Each of the plaintiffs has applied for appointment to the County Probation Department as a Deputy Probation Officer II. This position carries a salary of $1,185 per month. There are some factual differences in the status of the three plaintiffs and in the treatment accorded their applications.

Chavez-Salido has resided here as a lawfully admitted permanent resident alien since 1955. His application to become a Deputy Probation Officer II was filed on March 27, 1975. An oral examination is given for this position, with 70 being the minimum passing grade. Chavez-Salido took the examination May 1, 1975, scored 95, and was notified that he was being placed on the eligibility list. In September, 1975, he was notified that a job opening existed. But shortly thereafter he was told he would have to show proof of citizenship to receive an appointment. Being unable to do so, he was denied employment. The denial is stipulated to have been solely the

result of the citizenship requirement of Government Code § 1031(a).

The County also has a position called Deputy Probation Officer Trainee, paying substantially less than Deputy Probation Officer II. The Trainee position does not require citizenship since it is not given by law the status or powers of peace officer. Chavez-Salido was offered the Trainee position on December 1, 1975 and accepted it. He had applied for American citizenship well before applying to become a probation officer. His citizenship petition was granted and he was made a citizen on March 15, 1976. However, by that time, his name had been taken off the eligibility list for Deputy Probation Officer II. In August, 1976, he was promoted to the position of Deputy Probation Officer I. The Officer I position pays more than the Trainee position but less than the Officer II position and citizenship is required for it.

Plaintiff Ybarra has been a lawfully admitted permanent resident alien since 1972. On August 22, 1975 he applied for the position of Deputy Probation Officer II. He scored 70 on the examination. On the same date Ybarra also applied for the Trainee position. On October 8, 1975 he applied for the position of Deputy Probation Officer I. He passed the Officer I examination with a score of 80. He was told that he was qualified for both probation officer positions, that there was a job open in the I category, but no job was open in the II category although he would be placed on an eligibility list for the latter. He was also told that for both probation officer positions he was required to present proof of citizenship. Being unable to do so, he was denied the Officer I appointment and a position on the eligibility list for Officer II. It is again stipulated that these denials were solely the result of the statutory citizenship requirement. Ybarra was employed by the Los Angeles City Housing Authority during the entire application and

---

1. Defendant Nesvig has been succeeded as Chief Personnel Officer of the County by Harry L. Hufford. Defendant Cabell has been succeeded as Chief Probation Officer of the County by Kenneth Fare. In both situations the present incumbent has been substituted for his predecessor under Fed.R.Civ.P. 25(d)(1).

examination period and apparently is still so employed. Ybarra has not to this date applied for American citizenship.

Plaintiff Bohorquez has been a lawfully admitted permanent resident alien since 1961. At the time the case was argued, he had never applied for American citizenship and, so far as we know, has still not done so. His application for the position of Deputy Probation Officer II was filed January, 1975. He was given the oral examination on May 5, 1975 but during the examination was told that he could not receive an appointment to the position sought because of his lack of citizenship. He was subsequently notified that he had failed to achieve a passing score of 70 on the examination. There is a procedure whereby an applicant can appeal his examination results. Bohorquez was notified that because he failed to meet the citizenship qualifications it would be useless to appeal. He therefore did not appeal and has refrained from filing further applications, though he is still desirous of appointment. Bohorquez was unemployed at the time of his application and examination and has remained unemployed since. It appears that he never sought appointment as a Probation Officer Trainee. Whereas Chavez-Salido and Ybarra seek damages by way of back pay as part of their relief, Bohorquez seeks only the opportunity to take a new examination.

Each plaintiff was at all times willing to take the loyalty oath prescribed in the California Constitution for all public employees. Cal.Const. art. XX, § 3. That oath includes an agreement to support and defend the Federal and State Constitutions.

The first amended complaint, upon which the case was tried,[2] challenges § 1031(a) and the citizenship requirement therein contained, under the equal protection clause of the 14th Amendment and under two provisions of the Civil Rights Acts, 42 U.S.C. §§ 1981 and 1983. These challenges articulate a claim of unlawful discrimination on the basis of alienage. In addition, the complaint asserts that § 1031(a) unconstitutionally infringes upon plaintiffs' right to travel and upon Congress' power to regulate aliens. The latter claim invokes the supremacy clause of the Federal Constitution. Each plaintiff seeks a declaratory judgment invalidating the statute and injunctive relief prohibiting its application to him. All three plaintiffs seek attorneys fees. As stated, two plaintiffs seek money damages.

Plaintiffs requested the convening of a three-judge court under 28 U.S.C. §§ 2281 and 2284.[3] Defendants agreed that a three-judge court should be convened and the Chief Judge of the Circuit appointed the members of the three-judge court on April 26, 1976.[4] The case was tried and argued August 20, 1976.

2. The first amended complaint was originally drawn as a class action. Before the trial, by stipulation of all parties, an order was entered striking all class action claims and aspects.

3. During the pendency of the action, Congress enacted new legislation substantially limiting the availability of three-judge courts. The Three-Judge Court Amendments of 1976, Pub.L. No. 94–381, 90 Stat. 1119. The new law by its terms does not apply to actions commenced before its enactment, i. e. August 2, 1976, and thus the instant case was unaffected by the new statute.

4. We are aware, of course, of the teaching of the Supreme Court in *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). *Hagans* holds that before resorting to a three-judge court, the single district judge should exhaust all potentially dispositive claims within his jurisdiction. The claim in the instant case of invalid state intrusion into the federal power

to regulate immigration is not based on any alleged conflict between § 1031(a) and any specific federal law or regulation. Plaintiffs refer only generally to the Immigration and Naturalization Act, 8 U.S.C. § 1101 *et seq. Hagans* describes a claim that direct conflict between a specific state statute and a specific Congressional enactment renders the state statute "unconstitutional". The opinion in *Hagans* denominates such a conflict claim as "statutory" and differentiates it from a claim of a clearly constitutional nature. *Hagans* holds that the single district judge must decide such a statutory claim before requesting that a three-judge court be convened to consider other claims. The supremacy clause claim of the plaintiffs here, like their other claims of unconstitutionality, derives "exclusively and directly from the Federal Constitution rather than from federal legislation [and] entail[s] an immediate resort to the Constitution . . . ." *Norwick v. Nyquist,* 417 F.Supp. 913, 916 (S.D.N.Y.1976). All of the claims of the instant plaintiffs are of a

## II

## JURISDICTION

The individual defendants do not contest the jurisdiction of this court to entertain the instant action against them. They apparently concur in plaintiffs' assertion that a claim is stated against them which is cognizable under 42 U.S.C. § 1983, with jurisdiction accruing to this Court under 28 U.S.C. § 1343(3). Section 1983 imposes liability on any *person* who, under color of state law, deprives another of "any rights, privileges, or immunities secured by the Constitution . . . ." Section 1343(3) grants to the district courts original jurisdiction to redress any deprivation of constitutional rights of the type described in § 1983.

But Defendant Los Ángeles County does contest our jurisdiction. Plaintiffs argue that their complaint states a claim against the County both for violation of their equal protection rights under the 14th Amendment and for violation of 42 U.S.C. § 1981. Section 1981 in relevant part reads:

> "All persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."

Plaintiffs argue that if a claim is stated under either or both of these bases, our jurisdiction over the County derives from 28 U.S.C. § 1331(a), the general grant to the district courts of federal question jurisdiction. Section 1331(a) confers jurisdiction in all civil actions which arise "under the Constitution, laws, or treaties of the United States" and "wherein the matter in contro-

versy exceeds the sum of value of $10,000 . . . ."

Defendant County strongly urges that it, as a political subdivision, is not suable under § 1981. The County unfortunately took no position, either in its brief or in argument, as to plaintiffs' asserted alternative basis of liability, i. e. direct violation of the 14th Amendment. We have examined both bases as well as the question of the existence in the case of the $10,000 amount in controversy requirement under § 1331(a).

We hold that the complaint states a cognizable claim against the County on both 14th Amendment and § 1981 grounds and that the amount in controversy exceeds $10,000. Therefore, we hold that this court has jurisdiction of the claim against the County under § 1331(a).

### (A) *The Section 1981 Claim*

It is settled that the right to be free from illegal discrimination in employment is encompassed within the right "to make and enforce contracts" protected by § 1981. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). *Johnson* involved racial discrimination in employment. In *Graham v. Richardson,* 403 U.S. 365, 277, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) the Supreme Court held that aliens are within the class protected by § 1981 and may utilize that section as plaintiffs. *Graham* involved welfare benefits. Although neither the Supreme Court nor our Circuit have spoken on the question of alienage discrimination in employment, the Fifth and Seventh Circuits in carefully considered opinions, and a number of district courts, have held that § 1981 applies to discrimination in employment based on alienage as well as to employment discrimination which is racially based.[5] We

---

clearly constitutional nature. None of the claims is "statutory" in the *Hagans* context. Therefore, in our view, a three-judge court was properly convened.

5. *Guerra v. Manchester Terminal Corp.,* 498 F.2d 641 (5th Cir. 1974); *Roberto v. Hartford Ins. Co.,* 177 F.2d 811 (7th Cir. 1949), *cert. denied,* 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed.

1343 (1950); *Spiess v. C. Itoh & Co. (America), Inc.,* 408 F.Supp. 916 (S.D.Tex.1976); *Hollander v. Sears, Roebuck & Co.,* 392 F.Supp. 90 (D.Conn.1975); *Mohamed v. Parks,* 352 F.Supp. 518 (D.Mass.1973); *Lopez v. White Plains Housing Authority,* 355 F.Supp. 1016 (S.D.N.Y.1972); *League of Academic Women v. Regents of Univ. of Calif.,* 343 F.Supp. 636 (N.D.Cal.1972). *Cf. Campbell v. Gadsden*

choose to follow those holdings.

■ So we turn to the question of whether an action under § 1981 may be maintained against a political subdivision of a state.

Since *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) it has been established law that a political subdivision of a state is immune from a damage claim under § 1983 because it is not a "person". And that immunity has been extended to claims for injunctive relief. *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973).

Since §§ 1981 and 1983 are parts of what is generally called the Civil Rights Acts, it is tempting to argue that a political subdivision's immunity from suit under one section extends to the others. And our Circuit in *Arunga v. Weldon,* 469 F.2d 675 (9th Cir. 1972) appears to have accepted that argument, holding that a political subdivision is also not amenable to suit under § 1981. The County's claim that it cannot be sued under § 1981 is founded almost exclusively on *Arunga.*

*County District School Board,* 534 F.2d 650 (5th Cir. 1976).

**6.** Arunga's papers throughout the record demonstrate that he was both unlearned and confused. The amended complaint is in one count; its jurisdictional paragraph cites only § 1983. A later paragraph merely mentions §§ 1981 and 1985 along with § 1983. The complaint does not mention § 1986 at all. The gravamen of the complaint is a prayer for money damages of $1.5 million dollars as general and exemplary damages for the assault upon plaintiff and his physical and mental suffering. Some of the damages sought for mental suffering are claimed to be for the emotional effect upon plaintiff of his grandfather's premature death resulting from the "humiliation" to plaintiff. Plaintiff denominated his case as a class action and for some obscure reason prayed that a three-judge court be convened for the purpose of declaring unconstitutional Article 11, Section 11 of the California Constitution which confers local police power upon counties and cities. In the City's original motion to dismiss, the points and authorities supporting it consisted of one sentence which asserted that "a city is not a 'person' under 42 U.S.C. §§ 1981–88". The motion to dismiss the amended complaint was likewise supported by a single sentence argument as follows:

We have pondered the *Arunga* opinion and in so doing, we have examined the record and the briefs. We believe, with the utmost respect, that *Arunga* may have been insufficiently considered and that it reaches an incorrect result. One district court in this district has previously declined to follow *Arunga, League of United Latin American Citizens v. City of Santa Ana,* 410 F.Supp. 873 (C.D.Cal.1976), and we do likewise. We also believe that whatever authority *Arunga* has, has been undermined by language in a more recent decision of the Supreme Court.

*Arunga* was an action brought in *pro. per.* by a black legally admitted resident alien of Kenyan nationality. He sued the City of Alameda and one of its police officers (who was never served) for a claimed physical assault arising out of an allegedly unlawful arrest.[6] The trial court twice granted the City's motion to dismiss for lack of jurisdiction. The first grant was with permission to amend, and following submission of an amended complaint, the second dismissal was granted without leave

"Plaintiff's 'AMENDED PLEADING' adds nothing except jibberish and still fails to state a cause of action against the City." *Diamond v. Pitchess,* 411 F.2d 565 (9th Cir. 1969); *Brown v. Town of Caliente,* 392 F.2d 546 (9th Cir. 1968).

*Diamond* and *Brown* are both § 1983 cases declaring municipal immunity. The trial court in neither of its dismissal orders cited any authority or stated any reason.

Arunga's brief on appeal does not mention § 1981 and does not even mention the suability of a political subdivision under any of the Civil Rights Acts. His brief is almost entirely devoted to the three-judge court issue and a discussion of state police power. The city's brief on appeal devotes only seven lines to the suability question, as follows:

"It is clear that a City may not be sued under 42 U.S.C. §§ 1981–85. *Monroe v. Pape,* 365 U.S. 167 [81 S.Ct. 473, 5 L.Ed.2d 492] (1961); *Moor v. Madigan* [458], F.2d [1217] (9th Cir. No. 71–3019; 71–3020, March 1972); *Diamond v. Pitchess,* 411 F.2d 565 (9th Cir. 1969); *Brown v. Town of Caliente,* 392 F.2d 546 (9th Cir. 1968). Under the authorities cited, the District Court was unquestionably correct in dismissing plaintiff's action as to the City."

to amend. The appeal followed. In the Court of Appeals the matter was submitted without argument. The opinion is per curiam and in two short paragraphs:

"The plaintiff filed an action against the City of Alameda alleging that he had been deprived of rights in violation of 42 U.S.C. §§ 1981 and 1986. The complaint was dismissed on motion upon the ground that the city is not a 'person' and cannot be sued under the Civil Rights Act. [sic] An amended pleading based upon the same statute against the same defendant was again dismissed and this appeal taken.

It is abundantly clear that a municipal corporation is not a 'person' subject to suit under 42 U.S.C. 1983. *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Moor v. Madigan,* 458 F.2d 1217 (9th Cir. 1972); *Diamond v. Pitchess,* 411 F.2d 565 (9th Cir. 1969). The district court was unquestionably correct and we affirm." (Footnote omitted).

We believe the first sentence of the opinion to be factually incorrect because we cannot find in the amended complaint any claim of a violation of § 1986. The second paragraph of the opinion, which contains the holding, makes what we believe a fundamental error with respect to § 1981, i. e. the assumption that liability is imposed by § 1981 only upon "persons". Whereas § 1983 does use that term defining who is liable, § 1981 does not use the term nor does it limit in any way who may be liable as a defendant for a violation.

It is unfortunate but understandable that the *Arunga* opinion assumes that various of the Civil Rights Acts (42 U.S.C. § 1981 through § 1988) and particularly §§ 1981, 1982 and 1983, should be construed and applied according to common rules and principles. This approach may well result from the fact that all of the substantive Civil Rights Acts were codified together in 1874 in the Revised Statutes.[7] But it ignores certain other important historical facts: (1) that §§ 1981 and 1982, which are companion sections, were originally enacted in 1866, whereas § 1983 did not become law until 1871[8] and (2) that §§ 1981 and 1982 are derived from, and based upon, the 13th Amendment, whereas § 1983 was enacted to implement the 14th Amendment.[9]

As the Supreme Court points out in *Monroe,* the legislative history of § 1983 and the use of the term "person" therein, preclude its application to political subdivisions. But a careful examination of the legislative history of §§ 1981 and 1982 establishes, we think, with equal clarity, that political subdivisions were intended to be included within their ambit. The legislative history of § 1981 to which we refer has been extensively collated by at least three other district courts. *Robinson v. Conlisk,* 385 F.Supp. 529 (N.D.Ill.1974); *Maybanks v. Ingraham,* 378 F.Supp. 913 (E.D.Pa.1974); *League of United Latin American Citizens v. City of Santa Ana, supra.* It serves no useful purpose for us to duplicate or reproduce those discussions; we incorporate them by reference.

The Supreme Court, post-*Arunga,* has said in analyzing § 1982:

"[L]ike the Amendment upon which it is based, § 1982 is not a 'mere prohibition of State laws establishing and upholding' racial discrimination in the sale and rental of property, but rather [is], an 'absolute' bar to all such discrimination, private as well as public, federal as well as

---

7. For further discussion of the history of the codification, see *Runyon v. McCrary,* 427 U.S. 160, 168 n. 8, 96 S.Ct. 2586, 2593 n. 8, 49 L.Ed.2d 415 (1976).

8. With respect to the other parts of what has been called "The Civil Rights Acts", §§ 1987 and 1988 were enacted along with §§ 1981 and 1982, in 1866, and § 1986 was adopted with § 1983, as part of the Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13. A part of § 1985 was originally enacted in 1861, but the present full § 1985 was also adopted in 1871. Section 1984, which grants no substantive rights, was not enacted until 1875. Act of March 1, 1875, ch. 114, § 5, 18 Stat. 337.

9. In addition to §§ 1981 and 1982, §§ 1987 and 1988 are also based upon the 13th Amendment, while §§ 1985 and 1986, along with § 1983, were enacted pursuant to the 14th Amendment.

state." *District of Columbia v. Carter,* 409 U.S. 418, 422, 98 S.Ct. 602, 605, 34 L.Ed.2d 613 (1974).

We read this language as an affirmation that all sources of discrimination, including governmental entities, are reachable under § 1982.

Because they are companion sections, having a common derivation and legislative history, it would appear that what applies to § 1982 applies with equal force to § 1981.[10]

Unfortunately, the Supreme Court has not yet decided the question of whether political subdivisions are suable under § 1981. One circuit and a number of district courts have held, as we hold, that they are.[11] Two district courts outside our Circuit, relying on *Arunga,* have held that they are not.[12] The lack of a definitive Supreme Court decision and the paucity of other authority since *Arunga* probably results from the passage of the 1972 amendments to Title VII of the Civil Rights Act of 1964, making political subdivisions amenable to suit under Title VII for discrimination in employment.[13] The confusion caused by *Arunga* leads us to the fervent hope that our Circuit will shortly have occasion to take a second look at the legal question decided in it.

### (B) *The 14th Amendment Claim*

A claim cognizable in this court is stated against the County under the 14th Amendment. Relatively recent authority makes clear that political subdivisions of states are answerable in the district courts for direct constitutional violations in a complaint seeking injunctive relief, damages or both, despite the absence of any statute specifically creating the cause of action.

In 1971 the Supreme Court held in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) that, without an enabling statute, liability in damages existed for direct constitutional violations with district court jurisdiction being found in § 1331(a). The defendants in *Bivens* were federal FBI agents and the direct constitutional violation alleged was a 4th Amendment violation. No extension of *Bivens* to agents of state or local government was needed since 42 U.S.C. § 1983 provided a specific remedy in the federal courts against them, and 28 U.S.C. § 1343(3) provided clear federal jurisdiction.

Utilizing the *Bivens* rationale, the Supreme Court later clearly *implied* that an action may be brought in the federal courts against political subdivisions of states for direct constitutional violations including 14th Amendment violations. *City of Kenosha v. Bruno, supra.*[14] After twice de-

**10.** *Jones v. Alfred Mayer Co.,* 392 U.S. 409, 422 n. 78, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Bowers v. Campbell,* 505 F.2d 1155, 1157–58 (9th Cir. 1974); *Macklin v. Spector Freight Systems, Inc.,* 156 U.S.App.D.C. 69, 478 F.2d 979, 993–94 (1973).

**11.** *Campbell v. Gadsden County District School Board, supra* note 5; *League of United Latin American Citizens v. City of Santa Ana,* 410 F.Supp. 873 (C.D.Cal.1976); *Robinson v. Conlisk,* 385 F.Supp. 529 (N.D.Ill.1974); *Hines v. D'Artois,* 383 F.Supp. 184 (W.D.La.1974); *Maybanks v. Ingraham,* 378 F.Supp. 913 (E.D.Pa. 1974).

**12.** *Redding v. Medica,* 402 F.Supp. 1260 (W.D. Pa.1975); *Black Brothers v. City of Richmond,* 386 F.Supp. 147 (E.D.Va.1974).

**13.** Plaintiffs in our case cannot resort to Title VII because discrimination based on alienage is not included within the types of discrimination prohibited by it. *Espinoza v. Farah Manufac-*

*turing Co.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1974).

**14.** Plaintiffs were holders of retail store and tavern liquor licenses whose renewal applications had been denied by the two defendant cities under procedures set up by state statute. Alleging that their renewal applications were unconstitutionally denied, they sought injunctive relief including a declaration that the statutes involved were unconstitutional. A three-judge district court held that a claim under § 1983 was properly pled against the cities because only equitable relief was sought, and found jurisdiction under § 1343(3). The Supreme Court reversed the § 1983 holding but remanded the case rather than ordering judgment for the defendant cities. The remand order assumed that jurisdiction might well exist under § 1331(a) if the requisite amount in controversy was shown to exist. Two Justices, in a concurring opinion, viewed the remand as a holding by the Court, for the first time, that jurisdiction existed under § 1331(a) for actions

clining to decide that question[15] our own Circuit has now specifically decided it. Relying on *Kenosha,* the Circuit held that political subdivisions of states may be sued for both damages and equitable relief for constitutional violations, with jurisdiction being provided by § 1331(a). *Gray v. Union County Intermediate Education Department,* 520 F.2d 803, 805 (9th Cir. 1975).[16] *Gray* involved a school district but the court characterized a school district as a "political subdivision" of a state. *Id.*

### (C) *Amount In Controversy*

Having determined that a claim "arising under the Constitution" and one also arising "under the laws" of the United States are presented, we have jurisdiction of that claim under § 1331(a) if the "amount in controversy exceeds $10,000."

█ The amount in controversy must be found to exist under § 1331(a) as to each plaintiff. *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). If attention is focused solely on the amount of awardable money damages, one might entertain a substantial doubt about the existence of the requisite $10,000 jurisdictional requirement in this case. No

plaintiff pleads money damages in any specific amount. One plaintiff seeks no money damages at all. The other two, who were employed in other positions during the period in question, seek damages consisting of "back pay and seniority benefits". If each of those plaintiffs must offset, by way of mitigation, the wages and benefits earned at other work, it is quite clear that neither could be awarded damages which exceed $10,000.[17]

But it is not proper, in deciding the amount in controversy, to focus solely on the money damage aspect of this case. Equitable relief, by way of injunction, is also sought here. In *Glenwood Light & Water Company v. Mutual Light, Heat & Power Co.,* 239 U.S. 121, 36 S.Ct. 30, 60 L.Ed. 174 (1915), the Court said of injunctive actions:

". . . The jurisdictional amount is to be tested by the value of the object to be gained by the complainant." 239 U.S. at 125, 36 S.Ct. at 32.

And of civil rights actions under 28 U.S.C. § 1331, it has been said that the amount in controversy is the value of the right to be protected. 1 Moore's Federal Practice § 0.96[3.–1] at 939.[18]

---

against a city charging direct constitutional violations. *See* concurring Opinion of Brennan, J., 412 U.S. at 516, 93 S.Ct. 2222.

**15.** *Aldinger v. Howard,* 513 F.2d 1257 (9th Cir. 1975), *aff'd,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *Ybarra v. City of Town of Los Altos Hills,* 503 F.2d 250 (9th Cir. 1974).

**16.** The Third and Fifth Circuits and other district courts are in accord that direct constitutional causes of action may be maintained against political subdivisions of states. *Reeves v. City of Jackson,* 532 F.2d 491 (5th Cir. 1976); *Skehan v. Board of Trustees,* 501 F.2d 31 (3rd Cir. 1974); *Redding v. Medica,* 402 F.Supp. 1260 (W.D.Pa.1975); *Williams v. Brown,* 398 F.Supp. 155 (N.D.Ill.1975); *Maybanks v. Ingraham, supra,* note 11; *Dahl v. Palo Alto,* 372 F.Supp. 647 (N.D.Cal.1974). But Cf. *Brault v. Town of Milton,* 527 F.2d 730 (2d Cir. 1975) (*en banc*).

**17.** The difference in pay between the trainee position accepted by Chavez-Salido and the position he now seeks is $333 per month and the period of denial is less than 18 months. As to Ybarra, the evidence indicates that he earned an average of about $900 per month during the

denial period in the job at the Housing Authority. For Ybarra, the denial period does not exceed 14 months.

**18.** We are mindful that some courts have in effect ignored the $10,000 jurisdictional requisite in cases involving claims of violation of constitutional rights. These courts seem to hold that constitutional rights are so precious that, by definition, they are in every case worth more than $10,000. *See e. g. Spock v. David,* 469 F.2d 1047 (3d Cir. 1972), *reargued,* 502 F.2d 953 (3d Cir. 1974), *reversed on other grounds sub nom. Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *CCCO–Western Region v. Fellows,* 359 F.Supp. 644 (N.D.Cal. 1972); *West End Neighborhood Corp. v. Stans,* 312 F.Supp. 1066 (D.D.C.1970). This view apparently stems from the separate opinion of Mr. Justice Stone in *Hague v. C. I. O.,* 307 U.S. 496, 529, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). There is substantial contra authority. *See e. g. Goldsmith v. Sutherland,* 426 F.2d 1395 (6th Cir.), *cert. denied,* 400 U.S. 960, 91 S.Ct. 353, 27 L.Ed.2d 270 (1970); *Giancana v. Johnson,* 335 F.2d 366 (7th Cir. 1964), *cert. denied,* 379 U.S. 1001, 85 S.Ct. 718, 13 L.Ed.2d 702 (1965). In the absence of any decision on the point from

Where a case involves denial of employment or dismissal from employment, courts have held that the amount in controversy may be met by considering the value of the job in question, i. e. the amount of money which plaintiff would earn in the job for the indefinite future or for the rest of his work expectancy. *Friedman v. International Association of Machinists,* 95 U.S. App.D.C. 128, 220 F.2d 808, 810 (1955); *Hiss v. Hampton,* 338 F.Supp. 1141, 1146 (D.D.C. 1972); *White v. Bloomberg,* 345 F.Supp. 133, 141 (D.Md.1972). We adopt that rule and under it, the case of each plaintiff amply meets the $10,000 amount in controversy requirement. The value of the position of Deputy Probation Officer II, which is the "object to be gained" by the complaint, exceeds $10,000.

Since we have found that a claim is stated against the County under both the 14th Amendment and § 1981 which is cognizable in a district court, and that the jurisdictional amount in controversy exists, we find jurisdiction against the County is granted to us under § 1331(a).[19]

\* \* \*

## III

## THE MERITS

In three recent cases the Supreme Court has invalidated state statutes or regulations requiring citizenship as a condition of obtaining public employment or licenses.[20] In *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) the Court struck

down a provision of the New York Civil Service Law which required citizenship for appointment to any position in the state's classified civil service. There were four named plaintiffs, all permanent legal resident aliens, who sued for themselves and for a class. Two of the plaintiffs were clerk-typists, one was a human resources technician, and the fourth an administrative assistant.

The Court's opinion emphasized the overbroad and indiscriminate nature of the statute, i. e. that the class of positions for which citizenship was required "reached . . . positions in nearly the full range of work tasks, . . . all the way from the menial to the policy making." *Id.* at 640, 93 S.Ct. at 2846. The opinion noted that citizenship was not required for the unclassified civil service within which many of the higher policy making decisions were included. The Court categorically rejected the claim that a state can confine public jobs, paid for by public resources, to citizens of the country. While observing that each state had the power to prescribe the qualifications of voters, elective office holders and holders of "important nonelective executive, legislative and judicial positions . . . [and] officers who participated directly in the formulation, execution, or review of broad public policy . . .," the Court emphasized that such a statute must be "narrowly confined". *Id.* at 647, 93 S.Ct. at 2850. In a provocative and much discussed passage the Court said:

---

our Circuit we decline to follow the cases first-above cited which find the amount in controversy invariably present because constitutional rights are not capable of valuation in monetary terms. For a full discussion of the entire problem, see the footnote in *Gomez v. Wilson,* 155 U.S.App.D.C. 242, 477 F.2d 411, 420 n.56 (1973).

**19.** We also note, *sua sponte,* that jurisdiction of the claim against the County may also exist under another jurisdictional statute, 28 U.S.C. § 1343(4).

Section 1343(4) is a grant to the district courts of original jurisdiction in any civil action "[t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights . . . ." Section 1343(4) is not broad enough to cover a charge of direct violation of the 14th Amend-

ment since the section is limited to civil actions arising "under any Act of Congress". But since we hold that the County is amenable to suit in a § 1981 action, § 1343(4) would give us jurisdiction and without respect to the amount in controversy. *Bowers v. Campbell,* 505 F.2d 1155 (9th Cir. 1974); *Campbell v. Gadsden County District School Board,* 534 F.2d 650 (5th Cir. 1976).

**20.** See also the summary affirmance by the Supreme Court in *Lefkowitz v. C.D.R. Enterprises, Ltd.,* —— U.S. ——, 97 S.Ct. 721, 50 L.Ed.2d 742 (1977), *aff'g C.D.R. Enterprises, Ltd. v. Board of Education of City of New York,* 412 F.Supp. 1164 (E.D.N.Y.1976) (three-judge).

"We recognize a State's interest in establishing its own form of government, and in limiting participation in that government to those who are within 'the basic conception of a political community.' *Dunn v. Blumstein*, 405 U.S. 330, 344 [92 S.Ct. 995, 1004, 31 L.Ed.2d 274] (1972). We recognize, too, the State's broad power to define its political community. But in seeking to achieve this substantial purpose, with discrimination against aliens, the means the State employs must be precisely drawn in light of the acknowledged purpose." *Id.* at 642–43, 93 S.Ct. at 2848.

*In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), decided the same day as *Sugarman*, struck down a rule of the Connecticut court system requiring citizenship as a prerequisite for admission to the bar. Plaintiff was a long-time resident of the United States who was married to an American citizen and thus apparently entitled to remain here indefinitely. The Court rejected the argument that the special role of the lawyer within the governmental system justified excluding aliens from the practice of law. Although a Connecticut lawyer is denominated as a "commissioner" of the Superior Court with the right to sign writs and subpoenas, acknowledge deeds, administer oaths, take depositions and command the assistance of sheriffs and constables in the exercise of his authority, the Court stressed that these duties did not involve matters of such high policy or responsibility as would authorize a state to entrust them only to citizens. As in *Sugarman*, the Court stressed the duties imposed on resident aliens, which include the same obligation to pay taxes, and serve in the Armed Forces as are imposed on citizens. It observed that while lawyers (and other state employees) are required to take an oath to support the Federal and State Constitutions, such oath is customarily administered to resident aliens inducted into the Armed Forces and is thus deemed to be consistent with citizenship in a foreign country. The Court concluded that Connecticut had failed to establish any compelling state interest in confining law practice to citizens.

In *Examining Board of Engineers v. De Otero*, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976), the Court struck down a statute of Puerto Rico restricting the issuance of licenses for the practice of civil engineering in the private sector, to U. S. Citizens. Puerto Rico was held to be "territory" within the ambit of federal civil rights and jurisdictional statutes. Among the justifications advanced by Puerto Rico for requiring citizenship was the claim that citizen engineers are more likely to be present in the community and to be financially more accountable than noncitizens, a matter of significance since engineers may be liable for malpractice for ten years under local law. Another justification offered was that by confining the privilege of practicing engineering to citizens, Puerto Rico could prevent the uncontrolled influx of Spanish-speaking aliens into this professional field. A third justification offered was to raise the prevailing low standard of living. The Court held that these justifications, like those of New York in *Sugarman* and Connecticut in *Griffiths*, were inadequate.[21]

21. In *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), the Supreme Court held unconstitutional a Civil Service Commission regulation requiring citizenship for practically all federal civil service positions. The holding that the Civil Service Commission was without power to exclude noncitizens from such a wide range of positions is a relatively narrow one. The Court said that such power, if it exists at all, belongs only to Congress and held that the exercise of such power by the Commission violated due process. The opinion contains interesting language which hints that Congressional, or even Presidential, action requiring citizenship as a prerequisite for federal government employment and justified as an inducement for immigrants to become citizens, might be valid. This inducement to citizenship justification has not been dealt with in any prior opinion of the Supreme Court or in any prior judicial opinion cited to us. It was not advanced in the instant case.

From these opinions of the Supreme Court we can abstract the rules of law which we must apply in judging the California statute in question here. First, the equal protection guarantee as embodied in the 14th Amendment extends to permanent resident aliens. Second, a state statute or regulation classifying citizens and noncitizens and attaching disabilities to noncitizenship, involves a "suspect classification". Third, any "suspect classification" is subject to strict judicial scrutiny; for the statute to survive the state must establish (1) that the suspect classification [alienage] serves a compelling state interest, (2) that the classification is reasonably necessary to promote that compelling state interest, and (3) that the statute be narrowly and precisely drawn so as to avoid a classification that "sweeps too broadly".

We now proceed to measure the California statute, which is the subject of the instant case, against these criteria.

In relevant part, California Government Code § 1031(a) provides:

"In any instance in which . . . members of a class of public officers or employees are . . . *declared by law to be peace officers or to have the powers of peace officers*, each member of such class must meet at least the following minimum standards:

(a) Be a *citizen* of the United States." (Emphasis added)

California Penal Code § 830 and various subsections thereunder provide a very long list of occupations and positions classified as peace officers or having the powers thereof. Deputy probation officers are included. The footnote [22] contains the entire list

22. *Under § 830.1*
sheriff
undersheriff
deputy sheriff
policeman
marshal
deputy marshal
constable
deputy constable
*Under § 830.2*
highway patrolmen
members of the California State Police Division
members of the California National Guard when called into active service by the Governor
members of the University of California police department
members of a state college police department
*Under § 830.3*
officers and special agents of the Department of Justice, Bureau of Criminal Identification and Investigation
officers and agents of the Bureau of Narcotic Enforcement
investigators in the office of a district attorney
the Director and enforcement officers of the Department of Alcoholic Beverage Control
officers and investigators of the Division of Investigation of the Department of Consumer Affairs
investigators of the Board of Medical Quality Assurance
members and deputies of the Wildlife Protection Branch, Department of Fish and Game
county fish and game wardens
State Forester and employees of the Division of Forestry
voluntary fire wardens
officers and manager of compliance services of the Department of Motor Vehicles
investigators of the Department of Motor Vehicles
Secretary and Chief Investigator of the California Horse Racing Board
racetrack investigators of the California Horse Racing Board
police officers of a regional park district
state fire marshal, and deputy fire marshals
members of an arson-investigating unit of a fire department
members of a fire department of a local agency
inspectors of the Bureau of Food and Drug
park rangers
members of a community college police department
investigators of the Division of Labor Law Enforcement
*Under § 830.4*
security officers of the California State Police Division
Sergeant at Arms of each house of the Legislature
Bailiffs of the Supreme Court and the courts of appeal
guards and messengers of the State Treasurer's Office
director and employees of the Department of Navigation and Ocean Development
the administrator of a state hospital and police officers designated by him
railroad or steamboat company policemen commissioned by the Governor
sextons and superintendents of cemeteries
other cemetery personnel designated by a cemetery authority (See Health and Safety Code § 8325)
harbor policemen
special officers of the Department of Airports of the City of Los Angeles

which ranges all the way from important law enforcement positions to positions having apparently insignificant and menial duties. Included in the latter group are sextons and superintendents of a cemetery authority and other cemetery employees, inspectors of the Bureau of Furniture and Bedding Inspection, sealers of the Department of Weights and Measures and messengers of the State Treasurer's Office.

The only justification advanced by defendants in this case as a compelling state interest is the one described in *Sugarman*, the State's power to define its "political community". We read the references in *Sugarman* to the "political community" for which the State may prescribe citizenship as a requisite of office, as being confined to high policy making officers. When confronted with this reading, defendants argue that the California statute in issue is applicable to only a "few" positions which are either "high level" or require "demanding discretional decisions in their everyday execution." We cannot agree with the defendants. It is obvious from the long list of covered positions contained in the footnote that the statute is much broader than they claim and covers many positions with much less responsible duties than they describe. The claimed "political community" justification in this case, therefore, does not support this statute any more than it supported the requirement of citizenship for the classified civil service in New York State in *Sugarman*.

But even if we assume *arguendo* that the California statute serves a compelling state interest and employs a classification reasonably necessary to promote that compelling state interest, we would have to strike it down on the ground that it is not narrowly and precisely drawn and that it "sweeps too broadly." [23]

the chief of toll services of the Department of Transportation and his captains, lieutenants and sergeants employed on vehicular crossings
members of a security patrol of a school district
authorized federal employees engaged in enforcing applicable state or local laws on federal property
Los Angeles County security guards
airport policemen designated by the Monterey Peninsula Airport District
airport security officers at airports operated by San Francisco, Orange or San Joaquin Counties
housing authority patrol officers employed by the housing authorities of Los Angeles or Contra Costa Counties
*Under § 830.5*
parole officers of the Department of Corrections
placement or parole officers of the Youth Authority
probation officers
deputy probation officers
warden, superintendent, supervisor or guards employed by the Department of Corrections
any employee having custody of a ward in an institution of the Youth Authority
transportation officers of the Youth Authority
*Under § 830.5a*
agents of the law liaison unit of the Department of Corrections
*Under § 830.6*
persons deputized or appointed as a reserve or auxiliary sheriff, deputy sheriff or city policeman
In addition to the above, the following have the powers of peace officers:

Any person summoned to the aid of any uniformed police officer as in a posse comitatus (Penal Code § 830.6[b])
the director, officers and employees of the Division of Aeronautics (Pub.Util.Code § 21252)
any person vested with the power of enforcing any provisions of the Agriculture Code (Agric. Code § 7)
county fire wardens and assistant and deputy fire wardens (Government Code § 24008)
inspectors of the Board of Dental Examiners (Business and Professions Code § 1704)
inspectors of the Bureau of Furniture and Bedding Inspection (Business and Professions Code § 19206)
inspectors of the Bureau of Livestock Identification (Agric.Code § 20432)
mental health counselors (Welfare and Institutions Code § 6778)
officers and employees of the state park system (Public Resources Code § 5008)
sealers of the Department of Weights and Measures (Business and Professions Code § 12013)

23. In various constitutional and statutory provisions, California requires citizenship as a qualification for holding statewide elective office including Governor and Lieutenant Governor and for holding certain top executive positions in state government. *See e. g.* Cal.Const. art. 5, §§ 2 and 9 and Government Code §§ 241, 1001 and 1020. We express no view as to the validity of those provisions; they are not in issue here.

Although the concept was not discussed in the briefs, at the argument of the case, the court and counsel discussed whether the validity of § 1031(a) should be considered as applied, i. e. as limited to the position of deputy probation officer which is the position sought by all three plaintiffs.

The prior decisions of the Supreme Court dealing with alienage, which we have discussed above, would appear to rule out consideration of the validity of this statute as applied. Those decisions stress that the scrutiny which should be afforded to such a statute must include an examination of whether it is too broad in its sweep, overinclusive. That is why we, as the Court did in *Sugarman*, have examined all of the types of positions for which citizenship is required. But we are also aware that in other contexts, the Supreme Court has resorted to the "as applied" technique for the announced purpose of avoiding advisory opinions and unnecessary constitutional adjudication, especially where the outer parameters of the state statute are cloudy and unadjudicated. *See, e. g., United States v. Raines*, 362 U.S. 17, 20–22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). So, out of an abundance of caution, we proceed to examine § 1031(a) as applied.

The evidence before us contains no description of the duties performed by a deputy probation officer in California. However, counsel stipulated at the argument that we may take judicial notice of those duties based on our experience as judges. It is fortunate that all three members of this court had extensive experience as state court judges in California before appointment to the federal bench.

Deputy probation officers in California perform a wide range of duties. They include preparation of presentence investigations and recommendations as to sentence, supervision of probationers (including efforts to ameliorate their employment, health and family problems) and investigation of probation violations. Also included are various duties in connection with juveniles and juvenile courts among which are the filing of juvenile court petitions charging both delinquency and illegal acts, presence at juvenile court hearings in an advisory capacity, placement of minors declared to be wards of the juvenile court and supervising custodial personnel in juvenile incarceration institutions. Important as those duties are, we cannot characterize a deputy probation officer as an employee who participates "directly in the formulation, execution, or review of broad public policy . . . ." *Sugarman, supra*, 413 U.S. at 647, 93 S.Ct. at 2850. Since a compelling state interest appears only when the requirement of citizenship is confined to positions of that type, the statute must be condemned even as applied. As in *Griffiths*, we would find that the duties of a deputy probation officer "hardly involve matters of state policy or acts of such unique responsibility as to entrust them only to citizens." 413 U.S. at 724, 93 S.Ct. at 2856. A similar approach has recently been taken in a well-reasoned opinion of a three-judge district court striking down a New York statute requiring public school teachers to be citizens. *Norwick v. Nyquist*, 417 F.Supp. 913 (S.D.N.Y.1976). If neither lawyers nor teachers can be required to be citizens, it would seem to us an *a fortiori* proposition that citizenship cannot be required for deputy probation officers.[24]

Having held that § 1031(a) violates the equal protection clause of the 14th Amendment, it follows that the denial of employment to the plaintiffs pursuant to § 1031(a) involves a violation of 42 U.S.C. § 1981 by the County and a violation of 42 U.S.C. § 1983 by the individual defendants. The County has denied to these plaintiffs the

---

**24.** Our opinion, in striking down § 1031(a) on its face and as applied, should not be read as holding that California could not constitutionally enact a citizenship requirement for a narrowly confined class of the most important peace officers. We do not decide, for example, whether county sheriffs or city police chiefs are within the state's "political community" or whether a citizenship requirement for them would be reasonably necessary to promote such a compelling state interest.

"same right . . . to make and enforce contracts . . ." as are enjoyed by citizens (§ 1981). The individual defendants have denied these plaintiffs "under color of [a State] statute . . . [the] rights, privileges, or immunities secured by the Constitution . . . ." (§ 1983).

Our decision herein should come as no shock or surprise either to the defendants in the instant case or to other California officials. Since no California court has passed upon the constitutionality of Government Code § 1031(a) up to this time the officials of Los Angeles County have apparently felt constrained to observe its requirements. But the California Attorney General seven years ago declared it to be unconstitutional.[25] His opinion appears correctly to have anticipated the Supreme Court's *Sugarman* decision. Additionally, the California Supreme Court in 1969 struck down a statute prohibiting the employment of aliens on public works[26] and, even before the Supreme Court spoke in *Griffiths*, invalidated a citizenship requirement for the practice of law.[27] And the California legislature, in 1970, repealed a blanket statute which required that every employee of the state and every county or city therein must be a citizen.[28] So the direction of the tide has been clear. One need not have qualified as a soothsayer to have predicted our present holding.[29]

Since we have declared § 1031(a) to be unconstitutional because it discriminates illegally on the basis of alienage the claims of plaintiffs involving the right to travel and intrusion on Congress' immigration powers are rendered moot. We decline to discuss or decide those claims.

**25.** 53 Cal.Atty.Gen.Opin. 63 (1970).

**26.** *Purdy & Fitzpatrick v. State*, 71 Cal.2d 566, 79 Cal.Rptr. 77, 456 P.2d 645 (1969) (invalidating Labor Code § 1850).

**27.** *Raffaelli v. Committee of Bar Examiners*, 7 Cal.3d 288, 101 Cal.Rptr. 896, 496 P.2d 1264 (1972).

**28.** *See* Historical Note preceding California Labor Code § 1960.

## IV

## RELIEF

If the statute is declared unconstitutional, defendants do not appear to dispute the specific relief sought by the various plaintiffs except as to damages and attorneys fees.

All three plaintiffs seek a declaratory judgment that Government Code § 1031(a) is unconstitutional and an injunction preventing its enforcement against them. Such declaratory judgment and injunction shall issue. The judgment will run against all defendants and will bind the successors in office of the individual defendants.

As to Plaintiff Chavez-Salido, the judgment will contain an order requiring his immediate appointment to the position of Deputy Probation Officer II–Spanish Speaking, with seniority rights retroactive to September, 1975. As to Plaintiff Ybarra, the judgment will contain an order requiring his immediate appointment to the position of Deputy Probation Officer I with seniority benefits retroactive to January, 1976. The judgment will further order his restoration to the eligibility list for Deputy Probation Officer II–Spanish Speaking, retroactive to November, 1975.

As to Plaintiff Bohorquez, the judgment will contain an order directing defendants to invalidate the results of the examination for Deputy Probation Officer II–Spanish Speaking, which he took in May, 1975 and requiring them immediately to give him another test. Should Bohorquez pass the new test, the judgment will order him restored to the eligibility list for that position retroactive to May, 1975.

**29.** It would have been preferable, in the interests of harmonious federal-state relationships, for plaintiffs to have sought relief in the state courts instead of mounting their initial challenge in the federal courts. In the lights of the above-mentioned California decisions and Attorney General's opinion, it appears that a 14th Amendment challenge in the state courts might well have succeeded. However, in our view, plaintiffs' bypass of state court remedies, for whatever reason, does not warrant abstention on our part.

We pass now to the issue of damages. Plaintiffs have formally renounced any intention to seek a damage award against any individual defendant.[30] Thus the court is not required to consider certain difficult questions of governmental employee immunity which would arise if money damages were sought against the individuals.

However, plaintiffs do press their claim for money damages against the County. It is settled that a county is not clothed with the immunity from money damage awards enjoyed by a state under the 11th Amendment, unless the county's damage obligation would be paid out of the state treasury. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The County makes no showing that if damages are awarded against it, they must be paid from state funds. Thus, the County is not immune. But whether damages should be awarded against the County under the facts of this case is a matter that we, as a three-judge court, decline to decide at this point.

The parties have neither briefed nor argued for us a number of questions related to a possible damage award against the County. These include (1) whether damages are compelled or discretionary, (2) if discretionary, what factors should be considered in exercising that discretion, and (3) the measure of damages, including whether there should be an offset by way of mitigation for sums earned in other employment. We therefore refer the matter of damages to the single judge to whom the case was originally assigned for further consideration by him. He will have authority to enter any further judgment on the issue which he deems appropriate. One difficult question to be considered by the single judge is whether damages should be awarded at all where the act complained of as being illegal was the County's observance of the clear and unequivocal mandate of a state statute

which had not been declared unconstitutional by any court.

The plaintiffs also seek attorneys fees, but only against the County. At the time of the filing of this action and its trial, it appeared that attorneys fees were not awardable in civil rights damage actions except where specific authority to award them was contained in the applicable statute. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). And, there was no specific statutory authority for fees which applied to our case. However, after the argument, a new statute on the subject became effective which authorizes discretionary awards of attorneys fees to the prevailing party in certain civil rights matters. The Civil Rights Attorney's Fees Awards Act of 1976, Pub.L.No. 94–559, 90 Stat. 2641. The new Act is not expressly applicable to cases pending on the date of its enactment, but a recent action of the Supreme Court indicates that it may well be,[31] and a recent district court decision so holds.[32]

It is therefore appropriate for us also to refer the attorneys fees question to the single judge to whom the case was originally assigned, with authority to decide it.

This opinion will constitute this court's findings of fact and conclusions of law as to the issues herein decided and the partial judgment herein ordered. Counsel for plaintiffs will prepare and submit a partial judgment within ten days. Defense counsel, if the proposed partial judgment is not approved by him as to form, will have ten days further in which to file written objections which will not change the result. The single district judge to whom the case was assigned, after deciding the unresolved questions referred to him herein, may sign and file a final judgment in the case.

---

**30.** See the stipulation of counsel filed Jan. 13, 1976 which renounces both damages and attorneys fees as against the individual defendants.

**31.** See the summary disposition in *Stanton v. Bond*, —— U.S. ——, 97 S.Ct. 479, 50 L.Ed.2d 581 (1976).

**32.** *Wade v. Mississippi Cooperative Extension Service*, 424 F.Supp. 1242 (N.D.1976).

## ADDENDUM TO OPINION

Following the filing of our Opinion on February 3, 1977, we became aware for the first time of an *en banc* decision of our Circuit in *Sethy v. Alameda Co. Water District,* 545 F.2d 1157 (9th Cir. 1976). It was published in Federal Reporter (2d Series) after our Opinion was filed. In *Sethy,* the Circuit appears to overrule *Arunga v. Weldon,* 469 F.2d 675 (9th Cir. 1972) and explicitly holds that a municipal subdivision may be sued under § 1981. Our Opinion is in accord with the *Sethy* decision and *Sethy* in no way affects either the rationale or the result we reached herein.